**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **8:05CR83** |
| | ) | |
| vs. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MANUEL L. MARTINEZ and** | ) | |
| **BONNIE S. TIMLICK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the court on the motions of the defendants Manuel L. Martinez (Martinez) (Filing No. 17) and Bonnie S. Timlick (Filing No. 20) to suppress. The defendants filed briefs in support of their respective motions (Filing Nos. 18 and 21). The government filed one brief (Filing No. 23) in opposition to both motions to suppress. The defendants are charged in the Indictment with possession with intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1) (Count I), and possession with intent to distribute less than 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1) (Count II). **See** Filing No. 1. The defendants challenge whether a reasonable articulable suspicion existed to detain their vehicle pending the arrival of a canine unit, on February 9, 2005, after a valid traffic stop.

On April 19, 2005, the court held an evidentiary hearing on the defendants' motions. Nebraska State Patrol (NSP) Trooper Robby A. Jackson (Trooper Jackson) testified during the hearing. The court received into evidence a videotape of the traffic stop (Exhibit 1); a photocopy of both an Arizona identification card and an Arizona driver's license (Exhibit 2); a vehicle registration (Exhibit 3); and a written warning violation card and citation (Exhibit 5). The transcript of the hearing was filed on April 28, 2005 (TR.). **See** Filing No. 27. There was no post-hearing briefing.

## FINDINGS OF FACT

On February 9, 2005, at approximately 12:53 p.m., Trooper Jackson[1] was in uniform and operating a marked patrol vehicle (TR. 7). Trooper Jackson was near the Dix interchange on Interstate 80 traveling westbound (TR. 7, 36). Trooper Jackson observed a black SUV traveling eastbound, which was exceeding the posted speed limit (TR. 7, 37-38). Trooper Jackson caught up with the vehicle, at approximately mile marker 30 which is in a rural area about two miles south of Dix, Nebraska, and conducted a traffic stop (TR. 7-8; Exhibit 1). As Trooper Jackson pulled the vehicle over he observed a large stuffed animal hanging from the rear-view mirror (TR. 9, 39).

Trooper Jackson approached the passenger's side of the vehicle and observed a second person sit up from the backseat (TR. 9-10, 39; Exhibit 1). Trooper Jackson made contact with the driver, who was identified as Manuel L. Martinez (TR. 9-10). Martinez produced an Arizona identification card and an Iowa vehicle registration (TR. 10; Exhibits 2 and 3). The only other occupant was lying in the backseat of the vehicle and was later identified as Bonnie Sue Timlick (TR. 10).

Martinez told Trooper Jackson that he (Martinez) did not have a driver's license (TR. 11). Trooper Jackson asked Martinez to step out of the SUV and accompany the trooper to the patrol vehicle (TR. 11). After Martinez stepped out of the SUV, Trooper Jackson observed Martinez wearing a large bulky coat (TR. 11-12). Martinez gave consent to a pat-down of the coat (TR. 12). Trooper Jackson did not find any weapons, but did find a large amount of U.S. Currency in the inner left coat pocket (TR. 12).

Martinez sat in the front passenger seat of the patrol vehicle while Trooper Jackson competed paperwork and ran records' checks (TR. 12). Trooper Jackson explained the

---

[1] Trooper Jackson has worked for the NSP as a State trooper for approximately six years (TR. 5). As a State trooper, Trooper Jackson is assigned to traffic enforcement and responds to traffic accidents and traffic control (TR. 5). Prior to his service with NSP, Trooper Jackson was in the United States Air Force and served as a security police officer for four years (TR. 5). Trooper Jackson went through the State Patrol Training Academy, which includes training regarding criminal interdiction. Additionally in July of 2000, Trooper Jackson attended a five-day criminal interdiction school given by NSP (TR. 6). In November 2001, Trooper Jackson was certified as a drug recognition expert. Finally, Trooper Jackson attended a five-day school regarding highway interdiction through the Florida Highway Patrol (TR. 6). Trooper Jackson estimates he has conducted approximately 5,000 traffic stops in his capacity as a State trooper (TR. 5).

reason for the stop was speeding and showed the radar unit to Martinez (TR. 12). Additionally, Trooper Jackson informed Martinez that the stuffed animal on the rear-view mirror was an obstruction and a traffic violation (TR. 12). Trooper Jackson informed Martinez that he (Trooper Jackson) was going to issue a warning for both violations and Martinez would have to remove the stuffed animal before leaving (TR. 12). The conversation between Trooper Jackson and Martinez was conducted in English (TR. 13).

Trooper Jackson asked Martinez about the status of his driver's license (TR. 13). Martinez explained his driver's license had been suspended for a DUI violation (TR. 13). Trooper Jackson verified the truth of that statement with dispatch and obtained Martinez's criminal history (TR. 13, 16). Martinez's criminal history included several drug trafficking charges and weapons charges (TR. 16). After receiving this information, Trooper Jackson asked Martinez about the currency in his coat (TR. 16). Martinez handed the currency to Trooper Jackson and stated it was $3,000 (TR. 17). Trooper Jackson noticed the bills were all $100 bills (TR. 17). Martinez stated he received the money from his job and that he worked at a bar in Iowa (TR. 17; Exhibit 1).

Pursuant to additional questioning, Martinez stated he lived in Fort Dodge, Iowa and that he used to live in Yuma, Arizona (TR. 14). Martinez stated he was traveling from Yuma, where he had been for one week, to Fort Dodge (TR. 14). Martinez stated the purpose for the trip to Yuma had been to visit his parents, with whom he and Timlick had stayed (TR. 15; Exhibit 1). Martinez stated Timlick was his girlfriend and had been for approximately four years (TR. 15). However, Timlick had been in Yuma when Martinez arrived (TR. 15). Martinez stated the couple had lived together once in a while (TR. 15-16). During the questioning Martinez made eye contact with Trooper Jackson (TR. 17).

After speaking to Martinez, Trooper Jackson approached the SUV again to make contact with the passenger, Timlick (TR. 17). Timlick produced an Arizona driver's license (TR. 10; Exhibit 2). Trooper Jackson asked Timlick questions about her travel plans (TR. 18). Timlick stated the driver had been a family friend for approximately eight years (TR. 18). Trooper Jackson asked whether Timlick and Martinez were boyfriend and girlfriend, to which Timlick responded, "well, kind of, sometimes" (TR. 22). Timlick told Trooper Jackson they had

3

traveled from Idaho and were going to Fort Dodge (TR. 18). However, Timlick confirmed they had started from Yuma, Arizona, where Timlick lived (TR. 19). Timlick explained Martinez drove to Yuma and stayed three days (TR. 22). Timlick did not know where Martinez stayed while in Yuma, but stated probably with friends (TR. 23). Timlick stated Martinez had no family in Yuma and he was from Cuba (TR. 23). Martinez was to take Timlick to Fort Dodge to pick up a broken down vehicle (TR. 19, 21).

Trooper Jackson ran a records check on Timlick's driver's licence to make sure it was valid (TR. 24). Trooper Jackson learned the license was valid, but that Timlick had a criminal history including narcotics violations (TR. 26). While conducting the records check, Trooper Jackson spoke to Martinez again (TR. 24). Trooper Jackson asked again about the nature of the trip and whether the pair were going to live in Fort Dodge (TR. 24). Martinez stated they were going to live in Fort Dodge (TR. 25). Martinez also stated his parents lived in Yuma and he gave Trooper Jackson an address (TR. 25).

Trooper Jackson observed Martinez's manner gradually change over the course of the traffic stop (TR. 27). Toward the end of the traffic stop, Trooper Jackson saw sweat rolling off of Martinez's forehead, even though it was a cold day (TR. 27). Additionally, Martinez was fidgeting and popping his knuckles increasingly over the course of the stop (TR. 27). Trooper Jackson asked Martinez if he was nervous and Martinez stated, "no" but his hand hurt (TR. 27). Trooper Jackson testified Martinez's reaction to the traffic stop was unusual because although individuals typically display some nervousness, such nervousness usually lessens over the course of the traffic stop rather than increases (TR. 51-52).

Trooper Jackson issued a written warning to Martinez for the traffic violations and a citation for operating a vehicle without a license and returned the other documents to Martinez (TR. 25, 27; Exhibit 5). Trooper Jackson asked Martinez if he had any questions about the citation and Martinez responded, "no" (TR. 28). Trooper Jackson told Martinez he was free to leave and Martinez made a fast gesture toward the door (TR. 28). Trooper Jackson then asked if he could have a few more minutes of Martinez's time and Martinez responded, "yes" (TR. 28). Trooper Jackson asked if Martinez was carrying any weapons or guns in the vehicle and Martinez said, "no," looking Trooper Jackson in the eye (TR. 28-29). Trooper Jackson

next asked if Martinez had any marijuana, cocaine, methamphetamine or heroin in the vehicle (TR. 28-29). Trooper Jackson observed Martinez sweating and an increase in his nervous behavior, and Martinez looked away and answered, "no" to each question (TR. 29). Trooper Jackson asked Martinez if, since he had no contraband, could Trooper Jackson search the vehicle (TR. 29). Martinez said "no" and that the last time officers searched his vehicle they broke the doors (TR. 29).

Trooper Jackson informed Martinez he (Trooper Jackson) felt he had enough reasonable suspicion to detain the vehicle and wait for a police canine to conduct an exterior sniff (TR. 30). Specifically, Trooper Jackson was relying on the nervous behavior, prior criminal histories and the amount and explanation for the currency carried by Martinez (TR. 30-31). Additionally, Trooper Jackson relied upon the conflicting stories given by Martinez and Timlick, including the nature of their relationship, reason for and length of travel, and whether Martinez had family in Yuma (TR. 30). Finally, Trooper Jackson found suspicious the fact that Martinez had an Arizona identification card and lived in Fort Dodge, particularly because Yuma, Arizona is near the Mexico border, a source of narcotics into the United States (TR. 31).

Based on his suspicions, Trooper Jackson contacted dispatch to request a canine unit at 1:19 p.m. (TR. 31). The closest canine unit was located at mile marker 102 on I-80 (TR. 32). Martinez and Timlick moved about freely while waiting for the canine unit, except that Martinez was not allowed to return to the vehicle (TR. 33). The canine unit arrived at 2:08 p.m. (TR. 34). The police canine alerted to the odor of narcotics in the vehicle and officers later found illegal narcotics (TR. 34).

## ANALYSIS

The parties have agreed the issue before the court is whether Trooper Jackson had a reasonable articulable suspicion to detain the defendants' SUV pending the arrival of a police canine unit. The defendants do not otherwise contest the validity of police procedures in this matter.

Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and the issuing a citation. ***United States v. Fuse***, 391 F.3d 924, 927 (8th Cir. 2004); **see also** ***United States v. Sokolow***, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the motorist's destination, purpose of the trip and whether the police officer may search the vehicle. ***United States v. $404,905.00***, 182 F.3d 643, 647 (8th Cir. 1999); ***United States v. Allegree,*** 175 F.3d 648, 650 (8th Cir. 1999). The police officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. ***$404,905.00,*** 182 F.3d at 647; ***Allegree,*** 175 F.3d at 650-51. "A short detention for a dog sniff after the completion of a traffic stop does not violate the Fourth Amendment." ***United States v. Linkous***, 285 F.3d 716, 721 (8th Cir. 2002). However, "[t]he officer cannot continue to detain a motorist after the initial stop is completed, unless the officer has 'a reasonably articulable suspicion for believing' criminal activity is afoot." ***Fuse***, 391 F.3d at 927-28.

A "reasonable suspicion" must be more than an inchoate "hunch," nonetheless, the Fourth Amendment only requires law enforcement to articulate some minimal, objective justification for an investigatory stop. ***Sokolow***, 490 U.S. at 7. In determining whether Trooper Jackson had reasonable suspicion, the court must consider the totality of the circumstances in light of Trooper Jackson's experience. **See** ***Fuse***, 391 F.3d at 929. "Although each factor giving rise to reasonable suspicion may appear innocent when viewed by itself, 'a combination of factors may warrant further investigation when viewed together.'" ***Id.*** (**quoting** ***Linkous***, 285 F.3d at 720).

In this case, the traffic stop was not completed until Trooper Jackson returned the documents to Martinez. After that time, Trooper Jackson requested "another minute of time" for additional questions and a search. Martinez agreed to answer additional questions, but declined to allow a search. Therefore, the duration between the time when Trooper Jackson indicated the vehicle would be detained and when the canine unit arrived is the period of

6

detention at issue. The total period of the detention while awaiting arrival of the canine unit was approximately 50 minutes.[2]

Trooper Jackson, who is an experienced officer trained in highway drug interdiction, testified at the suppression hearing about several facts which raised his suspicion including: 1) unusual nervous behavior; 2) prior criminal histories; 3) the amount and explanation for the currency carried by Martinez; 4) conflicting stories given by Martinez and Timlick, including the nature of their relationship, reason for and length of travel, and whether Martinez had family in Yuma; and 5) Martinez had an Arizona identification card and lived in Fort Dodge, which was suspicious because Yuma, Arizona is near the Mexico border a source of narcotics brought into the United States. Based on this information, the court finds this matter is more akin to the facts of **Fuse**, rather than **United States v. Beck**, 140 F.3d 1129, 1134 (8th Cir. 1998) (finding insufficient reasonable suspicion to detain). In particular similarity to **Fuse**, the defendants' both had criminal histories and there was a display of unusual nervousness. Additionally, Trooper Jackson did not merely disbelieve the information given by the defendants about their travel plans, as in **Beck**, but the defendants gave conflicting information. **See *United State v. Barragan***, 379 F.3d 524, 529 (8th Cir. 2004) (noting conflicting stories support reasonable suspicion for further detention). Finally, the amount and denominations of the currency held by Martinez served to increase Trooper Jackson's reasonable suspicion. Accordingly, the court finds given the totality of the circumstances, the facts of this case are sufficient to demonstrate reasonable suspicion justifying continued detention of the defendants to conduct a dog sniff.

Therefore, the court finds, based on the circumstances of this case, the officer had a reasonable articulable suspicion to detain the SUV while the officers conducted a brief

---

[2] The defendants do not contend the length of the detention was unreasonable transforming it from an investigatory detention to an arrest, however the court finds the length of the detention was not unreasonable under the circumstances. **See *United States v. Maltais***, 403 F.3d 550 (8th Cir. 2005) (one and one-half to two hour detention waiting in remote area for canine unit reasonable); ***United States v. Bloomfield***, 40 F.3d 910, 916-17 (8th Cir. 1994) (en banc) (finding one hour wait for drug dog reasonable); ***United States v. White***, 42 F.3d 457, 460 (8th Cir. 1994) (finding delay of one hour and twenty minutes for arrival of drug dog reasonable).

investigation. Because the officer had reasonable suspicion to detain the SUV, the motions to suppress should be denied. Upon consideration,

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

1. Manuel L. Martinez's Motion to Suppress (Filing No. 17) be denied; and
2. Bonnie S. Timlick's Motion to Suppress (Filing No. 20) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 19th day of May, 2005.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge